# In The United States Court of Appeals

**FOR THE SEVENTH CIRCUIT**

———

BROWN COUNTY TAXPAYERS ASSOCIATION,
PLAINTIFF-APPELLANT,

v.

JOSEPH R. BIDEN, JR., *ET AL.*,
DEFENDANTS-APPELLEES.

———

On appeal from the United States District Court
For the Eastern District of Wisconsin
Case No. 1:22cv1171
The Honorable William C. Griesbach, Senior District Judge

———

## PLAINTIFF-APPELLANT'S EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

———

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Richard M. Esenberg
*rick@will-law.org*

Daniel P. Lennington
*dan@will-law.org*

330 E. Kilbourn, Suite 725
Milwaukee, WI 53202-3141
Phone: 414-727-9455
Fax: 414-727-6385

*Attorneys for Plaintiff-Appellant*

# RELIEF REQUESTED

As soon as Monday, October 17, 2022[1]—less than a week from today—the Biden Administration will start "automatically" cancelling student-loan debts owed by millions of borrowers. The blow to the United States Treasury and taxpayers will be staggering—perhaps more than one trillion dollars.

There is, as we shall see, little legal justification for the President to unilaterally spend *roughly 4% of the nation's Gross Domestic Product.* This step, which is certainly a major question under cases such as *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022), is predicated on a law passed under different circumstances to accomplish different purposes for different beneficiaries. A law designed to benefit military personnel and first responders who have been disadvantaged by their response to a discrete national emergency has been transformed into a warrant for the President to transfer a trillion dollars of debt onto taxpayers because he believes "conditions" may have made repayment more difficult for some

---

[1] The October 17, 2022, date was announced by Defendants in another case, *Nebraska v. Biden*, 4:22-cv-01040 (E.D. Mo. Sept. 30, 2022), ECF.14 ("Defendants will not discharge any student loan debt pursuant to the policy challenged in this case before October 17, 2022") and confirmed by counsel for Defendants in this case during a telephonic hearing, Doc. 11.

(but not all) recipients of his largesse. The assault on our separation of powers and upon the notion that the legislative power is vested in Congress is extraordinary, and perhaps unprecedented. Plaintiff therefore requests an injunction under Fed. R. App. P. 8(a)(2) preventing Defendant from forgiving any loans under the Plan pending appeal.

Given the short time frame, Plaintiff-Appellant requests emergency consideration of this request and a decision in time to allow review by the Supreme Court in the new few days. Plaintiff moved first in the district court under Fed. R. App. P. 8(a)(1)(C), *see* Doc.4&5, and this motion was denied for the reasons stated in its memorandum opinion, Doc.12.

Plaintiffs are aware that prudential notions of standing are an issue here. We are aware of the concern that federal courts not be transformed into forums for the abstract litigation of questions in which litigants without a concrete stake in the matter press claims that do not affect them. But that is not what's happening here. Plaintiffs are witnessing an enormous and illegal increase in the national debt that is being accomplished with complete disregard for limitations on the spending authority. Plaintiffs and those similarly situated are being asked to assume *one trillion dollars* in debt. All other creative attempts to find

standing have been frustrated by Defendants' unilateral changes in the program. Doctrine exists that would allow this matter to be heard. It simply cannot be the law that a President can hand out a trillion dollars with impunity.

## BACKGROUND

### I.      One-Time Student Loan Debt Relief Plan

About 43 million borrowers owe $1.62 trillion in student-loan debt to the U.S. Treasury. Doc.1:¶16. Congress provided several provisions allowing repayment plans, incentives, deferment, forbearance, and even loan cancellations. *See generally* 20 U.S.C. § 1087e, *see e.g.*, subsection (m). Congress has not, however, vested the President with the power to cancel whatever loans he wants whenever he wants.

On August 24, 2022, President Biden announced the "One-Time Student Loan Debt Relief" plan ("Plan"), Doc.1:¶19.[2] Under the Plan, Defendants will cancel up to $20,000 in federal loans to individuals with income below $125,000 (or $250,000 for households). Doc.1:¶20.[3]

---

[2] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

[3] https://studentaid.gov/debt-relief-announcement/one-time-cancellation.

Two mechanisms will trigger this action. First, some borrowers will apply in "early October 2022" to have their loans forgiven. Doc.1:¶16. Second, and most importantly for purposes of this motion, "around 8 million borrowers" will have their loans forgiven automatically "without applying" as early as Monday, October 17. *Id.*; *supra,* fn.1. Defendants' hair-trigger decision to wipe away perhaps a $1 trillion of assets of the Treasury with little or no notice, public input, or most importantly congressional action, necessitates this emergency injunction request.

In the Plan, Defendants announced an explicit racial motive. Motivated by a desire to "advance racial equity" and "narrow the racial wealth gap," Doc.1:¶28, the Plan, according to the White House, is "more likely" to help "Black students," "Black borrowers," and "other borrowers of color." *Id*. The White House favorably cited the Urban Institute, which claims that Defendants' chosen course will "disproportionately benefit Black borrowers." *Id*. There would be nothing wrong with a plan adopted for neutral reasons that happened to have differing impacts on different racial groups. But, here, Defendants designed and adopted the program, in part, *because* it has a racially disproportionate impact.

The Plan—which would wipe away perhaps $1 trillion from the United States' balance sheets by unchecked presidential fiat, Doc.1:¶27—will be transformational to our separation of powers, the rule of law, and the power of the President. Almost anything can be a national emergency. If a President can do this, then he will have been transformed into an officer who not only executes the law but makes it. And if courts can do nothing about it because of prudential concerns about standing, then the President's power will be unchecked and almost absolute.

## II.    Plaintiff's Injuries

The Brown County Taxpayer Association (BCTA) is an association of dues-paying members who pay federal taxes. Doc.1:¶6. BCTA's mission is to promote individual freedom and citizen responsibility; limited government that is fiscally responsible, transparent, and accountable; and economic policy that expands opportunity for the people of Brown County to prosper and live free, productive lives. Doc.1:¶5. BCTA and its members advocate in favor of fiscally responsible federal tax policy. BCTA members are specifically concerned about the rising federal debt and that debt's impact on their future tax liability. The Plan will, if implemented, negatively impact BCTA and each of its members, who will

pay higher taxes and live in an America that is less prosperous, more fiscally irresponsible, and burdened by a higher federal debt. Doc.1:¶7. Moreover, another trillion dollars in debt added through the unilateral action of the President would force BTCA to alter its advocacy activities. *Id*. BTCA alleges that Defendants unconstitutionally exercised congressional spending power, and in doing so, exceeded constitutional limitations, specifically the Appropriations Clause and the Equal Protection Doctrine. Doc.1:¶8.

## ARGUMENT

### I. Plaintiff Has Taxpayer Standing

Whether Plaintiff has standing is the most critical issue in this case, as Defendants have little chance of success on the merits. Standing has proved a stumbling block for plaintiffs wishing to challenge the Plan because Defendants, in response to lawsuits, have quickly made changes in a blatant attempt to blunt lawsuits. For example, after the Pacific Legal Foundation filed a challenge on behalf of an employee who would have faced a tax penalty because of the Plan's details, Defendants immediately added an "opt-out" to nullify that plaintiffs' standing. *See Garrison v. U.S. Dep't of Ed.*, 1:22-cv-1895 (S.D. Ind. Sept. 27, 2022)

(motion for TRO denied because of Defendants' change to the program, *see* Doc. 16). And then after six states filed a lawsuit to challenge the plan based, in part, on the states' operation of loan servicing agencies, Defendants changed the plan yet again. *See Nebraska v. Biden*, No. 4:22-cv-1040 (E.D. Mo. Sept. 29, 2022); *see* NPR, "In a reversal, Education Dept. is excluding many from student loan relief," (Sept. 30, 2022).[4] Just this week, Defendants even boldly asserted that because of their newest changes, in part, the States do not even have standing to challenge the Plan, even if they run their own loan servicing agencies. *See Nebraska, supra,* ECF.27:10–19.

The argument that a President may unilaterally forgive perhaps over a trillion dollars in debt owed to the U.S. Treasury through executive fiat, and that *no one* has standing to challenge him, threatens the very foundations of a constitutional republic. If Defendants are correct, a future President could similarly order the IRS to implement a $1 trillion tax holiday—a program that would be "lawful" because no one would have standing to challenge it. This simply cannot be the case. The federal

---

[4] https://www.npr.org/2022/09/29/1125923528/biden-student-loans-debt-cancellation-ffel-perkins

judiciary cannot be relegated to a mere bystander observing constitutional infractions of the highest orders. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

Plaintiff brings this taxpayer standing claim under *Flast v. Cohen*, *infra*, which permits taxpayers with legal standing to challenge a President who usurps congressional spending powers and at the same time violates an express constitutional prohibition on that spending power. While we understand that *Flast* has been little used such that it is common to suppose that "taxpayer standing" never exists, it has not been overruled and that fact is as important as the infrequency of its use. We acknowledge that the conditions for the application of *Flast* will not often be present. Applying *Flast* to these facts, Plaintiff believes it meets that test, or at most, argues for a cabined expansion to be used only in the most extraordinary cases, like this one.

## A.    Federal Taxpayer Standing

In 1923, the United States Supreme Court ruled that a federal taxpayer did not have standing to challenge the Maternity Act of 1921. *Frothingham v. Mellon*, 262 U.S. 447 (1923). Four decades later, the

Court reconsidered taxpayer standing and whether the "Frothingham barrier" should be "lowered." *Flast v. Cohen*, 392 U.S. 83, 85 (1968). The Court found that it should and decided that the *per se* rule on taxpayer standing was not a constitutional rule. *Id.* at 93. The bar, according to the Court, was based on "pure policy considerations." *Id.* For example, "Frothingham was denied standing not because she was a taxpayer but because her tax bill was not large enough." *Id.* The *Frothingham* court also based its decision on concerns that general taxpayer standing would "open the door of federal courts to countless such suits." *Id.* The Court rejected these concerns, noting that some taxpayers have significant federal tax liability and that class action rules have mitigated the concern about "countless similar suits." *Id.* at 94.

The *Flast* Court emphatically rejected the concept that "under no circumstances should standing be conferred on federal taxpayers to challenge a federal taxing or spending program." *Id.* at 98. The Court then announced this two-part rule, which remains binding Supreme Court precedent. First, "a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. 1, § 8, of the Constitution." *Id.* at 102.

Second, "the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged." *Id.* "Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." *Id.* at 102–03.

After laying out the two conditions for taxpayer standing, *Flast* considered them together, explaining that the plaintiffs suffered a particular injury for standing purposes when, in violation of the Establishment Clause and by means of "the taxing and spending power," their property is transferred through the Government's Treasury to a religious entity. *Id.* at 105–106. "The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power." *Id.* at 106. *Flast* thus "understood the 'injury' alleged in Establishment Clause challenges to federal spending to be the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion alleged by a plaintiff." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 348 (2006)

(quoting *Flast*, 392 U.S. at 106). "Such an injury," *Flast* continued, is unlike "generalized grievances about the conduct of government" and so is "appropriate for judicial redress." 392 U.S. at 106. Of particular note, *Flast* found support for taxpayer standing in the "history of the Establishment Clause," especially contemporary founding documents. *Id.* at 103–104.

Admittedly, since *Flast*, many taxpayers have failed to meet its requirements. In 2007, a plurality of the Court found that the Freedom from Religion Foundation did not have standing to challenge the President's "faith-based initiatives." The opinion considered it dispositive that the money used for the initiatives was not from "specifically appropriat[ed] money. Instead, their activities are funded through general Executive Branch appropriations." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 595, 604–5 (2007); *see also Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011).

Plaintiff acknowledges that the Seventh Circuit has remarked, "[T]axpayers continue to have standing to sue for injunctive relief against specific congressional appropriations alleged to violate the Establishment Clause, but that is all." *Laskowski v. Spellings*, 546 F.3d

822, 827 (7th Cir. 2008). Respectfully, Plaintiff asserts both that *Flast*'s two-part test remains good law and that no Supreme Court decision has slammed the door on application of that test outside of the Establishment Clause context. No court has yet to apply *Flast* as Plaintiff urges here. But Plaintiff contends that applying the *Flast* test to the facts supports standing in this case.

## B.    Plaintiff's Taxpayer Standing

Plaintiff can demonstrate taxpayer standing here, or at the very least, make a good faith argument for a logical, cabined expansion of *Flast*.

First, Plaintiff challenges the exercise of "congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution." *Flast,* 392 U.S. at 102. Specifically, Plaintiff alleges that Defendants, as Executive Branch officials, have usurped congressional powers under that provision and created a program that obligates federal taxes and erases federal assets (in the form of debt) without any authority. Doc.1:¶¶8, 29–35. Only Congress may tax, spend, pay debts, and forgive debts. *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570

U.S. 205, 213 (2013) (congressional power to spend includes "the authority to impose" terms on their use).

Put succinctly and with apologies to Justice Robert Jackson, if there is a fixed star in our constitutional constellation, it is that the spending power is granted to Congress and not the President. Plaintiff has the legitimate expectation that its members' taxes will be spent according to lawful appropriations under the Constitution, not through executive fiat. As the Court said in *Flast,* "a taxpayer will be a proper party to allege the unconstitutionality of *exercises of congressional power*." 392 U.S. at 102 (emphasis added). Here, Defendants are unconstitutionally exercising that congressional power. Doc.1:¶¶34–35.

To the extent this Court believes that *Flast*'s language is limited to an exercise of power "by Congress," *see Flast,* 392 U.S. at 104, such a distinction is impractical. If *Flast* were so limited, if Congress passed a law forgiving student loans only to Christian students or to those whose demographics match supporters of the party controlling Congress, a taxpayer would have standing. But if the President did the same thing, there would be no taxpayer standing. But under *Flast*, a taxpayer has

standing in both cases because *Flast*'s concern was the unlawful exercise of the taxing and spending power, which is precisely the issue here.

Second, Plaintiff alleges that "the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power." *Flast*, 392 U.S. at 102–03. There are at least two specific constitutional limitations on the Plan.

1. **The Appropriations Clause.** The Constitution specifically limits presidential powers to only those authorized by Congress or the Constitution. The President's "power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). "Agencies have only those powers given to them by Congress." *West Virginia*, 142 S. Ct. at 2609. When "taxing and spending power" is exercised, it must be in conformity with the rest of Article I, specifically the Appropriations Clause, which prevents the Executive Branch from obligating the Government to pay money without statutory authority. *See* U.S. Const. art. 1, § 9, cl. 7. "Congress's control over federal expenditures is absolute." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012).

In 2012, then-Judge Kavanaugh wrote that the Appropriations Clause is a "bulwark of the Constitution's separation of powers among the three branches of the National Government." *Id.* at 1347. "If not for the Appropriations Clause, the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources at his pleasure." *Id.* (citation omitted); *accord Reeside v. Walker*, 52 U.S. 272, 291 (1851).

Here, Defendants are doing just that. They are exercising "unbounded power" by obligating the federal treasury, and in fact removing assets from the federal treasury, without legal authority. This violates the specific limitations imposed by the separation of powers, and more specifically, the Appropriations Clause.

Moreover, when Defendants point to a vague statute like the HEROES Act, and then claim congressional authorization, the limitations of the Major Questions Doctrine are implicated. As explained below, "extraordinary" claims of executive power must be based on "clear congressional authorization." *West Virginia*, 142 S. Ct. at 2609. By not basing their new spending program on "clear congressional

authorization," Defendants are exceeding a "specific constitutional limitation." *Flast*, 392 U.S. at 103.

As *Flast* explained, the "specific constitutional limitation" test is informed by the "specific evils" by "those who drafted" the relevant constitutional restriction "and fought for its adoption." *Id*. at 103. It is hard to overstate the importance of the constitutional design restricting the President from exercising a unilateral power over the purse, which has been in place since the founding. Federalist, No. 78; (Hamilton) (Congress "commands the purse"); Federalist, No. 58 (Madison) ("The power over the purse may [be] the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people."). By invoking the Appropriations Clause, Plaintiff alleges a specific limitation on the congressional spending power, like the limitation imposed by the Establishment Clause.

2. **Equal Protection Doctrine.** The Constitution also forbids federal spending based on race without meeting the requirements of strict scrutiny. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229 (1995). As more fully discussed *infra,* racially discriminatory intent amounts to a violation of equal protection principles. *See Vill. of*

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (collecting cases).

Defendants' Plan is designed to support "Black students," "Black borrowers," and "other borrowers of color,"[5] in a manner that "disproportionately benefit[s]" them.[6] If the President created a debt relief program to "disproportionately benefit white borrowers," no rational person would claim that such a plan comports with the Equal Protection Clause. "Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Miller v. Johnson*, 515 U.S. 900, 904 (1995) (citation omitted).

Again, the problem is not unintended disparate impact, it is disparate intent. Americans are entitled to a government that makes decisions without regard to race. The administration, by its own admission, did not do that. By invoking the Equal Protection doctrine,

---

[5] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

[6] https://www.urban.org/urban-wire/more-targeted-approach-student-loan-forgiveness

Plaintiff alleges a second specific constitutional limitation on the congressional spending power, as contemplated by *Flast.*

## II. Plaintiff is Likely to Succeed on its Claims that the Plan Exceeds Defendants' Constitutional and Statutory Authority

### A. Count 1: Separation of Powers

The President's "power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co.*, 343 U.S. at 585. And an "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). When the executive acts, it mostly points to "clear congressional authorization." *West Virginia*, 142 S. Ct at 2609.

Defendants do not claim that the President has any constitutional power to wipe a thirteen-figure sum from the balance sheets. That power belongs to Congress. *See, e.g., Agency for Int'l Dev.,* 570 U.S. at 213. Instead, Defendants point to a 9/11-era law, the HEROES Act (the "Act"). *See Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,943 (Aug. 30, 2022). That law, however, grants no clear authorization for Defendants to implement a $1 trillion nationwide debt cancellation plan.

### 1. The Major-Questions Doctrine Applies

The major-questions doctrine applies to the $1 trillion Plan. In *West Virginia v. EPA*, the Supreme Court explained that it "expect[s] Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." 142 S. Ct. at 2605 (citation omitted). In such cases, "modest words, vague terms, or subtle devices" cannot confer upon the Executive Branch the power to make "a radical or fundamental change" to a statutory scheme. *Id.* at 2609 (citations omitted). The Court presumes that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (citation omitted). In short, in "certain extraordinary cases," executive officials "must point to clear congressional authorization for the power [they] claim[ ]." *Id.* at 2634.

Several factors support the application of this principle to the Plan. Defendants claim the authority to resolve a matter of great "economic and political significance." *Id.* at 2608 (citation omitted). And Defendants are attempting to create a program that Congress has "conspicuously and repeatedly declined to enact itself." *Id.* at 2610; *see, e.g.,* S. 2235, 116th Cong. (2019); H.R. 2034, 117th Cong. (2021) (failed attempts to forgive

student loans). Through the Plan, Defendants are also exercising "unheralded power." *id.* at 2610 (citation omitted); *see also NFIB v. OSHA*, 142 S. Ct. 661, 666 (2022) ("It is telling that OSHA, in its half century of existence, has never before adopted a broad public health regulation of this kind"); *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.")

A new $1 trillion government spending program, resting solely upon authority granted to the Secretary of Education to do what he "deems necessary" during a "national emergency," 20 U.S.C. § 1098bb(a)(1)–(2)(A), is precisely the type of policy closely scrutinized by the Supreme Court under the Major Questions Doctrine. *See generally West Virginia*, 142 S. Ct. at 2620 (Gorsuch, J., concurring) (collecting cases applying the Major Questions doctrine).

### 2. Defendants cannot point to any clear Congressional authorization for this debt forgiveness.

Because the Major Questions Doctrine applies, Defendants must identify "clear congressional authorization." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 324 (2014). In reviewing Defendants' alleged authority, courts should employ "skepticism." *West Virginia*, 142 S. Ct. at 2614.

The purpose of the Act is to support "our nation's defense," "protect the freedom and secure the safety of its citizens," and to support the "men and women of the United States military [who] put their lives on hold, leave their families, jobs, and postsecondary education in order to serve their country and do so with distinction." 20 U.S.C.A. § 1098aa(b).

Under the Act, the Secretary of Education may "waive or modify any statutory or regulatory provision applicable" to federal student loan programs "as the Secretary deems necessary in connection with a war or other military operation or national emergency" 20 U.S.C.A. § 1098bb(a)(1). Under the Act, the Secretary's action is justified only if "recipients of student financial assistance under title IV of the Act who are affected individuals are not placed in a worse position financially in

relation to that financial assistance because of their status as affected individuals." 20 U.S.C.A. § 1098bb(a)(2).

Instead of claiming that the Act was passed to support the "men and women of the United States military" (as the law says), Defendants claim that the Act allows broad student loan forgiveness for anyone "who suffered financial hardship because of COVID-19"—in other words, any Americans the President deems worthy. *See Notice of Debt Cancellation Legal Memorandum*, 87 Fed. Reg. 52,943 (Aug. 30, 2022). It does not.

First, the student loan cancellation is not "necessary in connection with a … national emergency." 20 U.S.C. §1098bb(a)(1). Defendants did not announce this program until nearly two-and-a-half years after the pandemic began and a few weeks after the President declared that "[t]he pandemic is over." *See* David Cohen and Adam Cancryn, "Biden on '60 Minutes': 'The Pandemic is over,'" (Politico, Sept. 18, 2022).[7] Even the White House's own press release on the plan did not invoke a "national emergency," but merely mentioned in passing that the plan will "provide

---

[7] https://www.politico.com/news/2022/09/18/joe-biden-pandemic-60-minutes-00057423

more breathing room to America's working families as they continue to recover from the strains associated with the COVID-19 pandemic."[8] A policy to "provide more breathing room" to Americans "as they continue to recover" from a respiratory virus hardly sounds like a "war or other military operation or national emergency" denoted in the Act.

Second, the student loan cancellation plan is not "necessary to ensure that recipients of student financial assistance … are not placed in a worse position financially *in relation to that financial assistance* because of their status as affected individuals." 20 U.S.C. §1098bb(a)(2)(A) (emphasis added). To give meaning to each word in the text, the provision should be interpreted as a backstop to prevent a decline in the person's position vis-à-vis the loan at issue. Under this interpretation, the Act could help a service member deployed abroad and unable to send in their monthly payment. But the same rationale does not apply to Defendants' Plan, which puts their chosen class in a financially *better* position without any showing that the individuals were in a "worse place financially" with their loan repayments. There is no

---

[8] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

requirement that a beneficiary's ability to repay his or her loan has been impeded by COVID: no need to demonstrate that he or she missed work due to COVID, lost or was laid off from his or her job, or otherwise suffered a financial hardship. Indeed, it would be impossible to make such a claim because no one has been obligated to make payments on the loans since the national emergency on which Defendants rely began. For two years, Defendants have suspended "repayment of and interest accrual on all Federal loans held by the Department." 87 Fed. Reg. 41,878, 41,884 (July 13, 2022). "No one with federally held loans has had to pay a single dollar in loan payments."[9] The Plan is not "necessary" to ensure borrowers are not in a "worse position" as required by the Act.

Third, the plan is not limited to "affected individuals." 20 U.S.C. §1098bb(a)(2)(A). The Act defines "affected individuals," in relevant part, as people who (1) "reside[] or [are] employed in an area that is declared a disaster area by any Federal, State, or local official in connection with a national emergency" or (2) "suffered direct economic hardship as a direct result of a war or other military operation or national emergency, as

---

[9] https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/24/fact-sheet-president-biden-announces-student-loan-relief-for-borrowers-who-need-it-most/

determined by the Secretary." 20 U.S.C. § 1098ee(2)(C)–(D). But Defendants have not restricted debt cancellation borrowers who have suffered "direct economic hardship as a direct result" of the pandemic. The loan forgiveness applies to everyone, whether they suffered hardship or not.

## B. Count 2: Equal Protection Doctrine

The Constitution forbids racially motivated spending unless the requirements of strict scrutiny are met. *See Adarand,* 515 U.S. at 229 (federal spending based on race subject to strict scrutiny). Moreover, the Court, since at least the 1960s, has indicated that a racial motivation triggers a potential Equal Protection violation. In *Gomillion v. Lightfoot,* 364 U.S. 339, 341 (1960), Alabama changed the boundaries of the City of Tuskegee. Plaintiffs sued, claiming that the boundary change was a "device to disenfranchise" black voters—in other words, that the boundary change had an impermissible racial motivation. The court agreed, explaining that the plaintiffs had stated a claim because, if true, the "legislation is solely concerned with segregating" black voters "so as to deprive them of their pre-existing municipal vote." *Id.*

In 1977, the Court confirmed that racially discriminatory intent amounts to a violation of equal protection principles. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (collecting cases). In *Arlington Heights*, a developer sued local authorities claiming that the refusal to rezone a tract of land was racially discriminatory. The Court explained, "When there is proof that a discriminatory purpose has been a *motivating factor in the decision*, this judicial deference is no longer justified." *Id*. at 265–66 (emphasis added).

Again, in *Hunter v. Underwood*, 471 U.S. 222 (1985), the Court found that a racially neutral state law "was motivated by a desire to discriminate against blacks on account of race" and therefore violated the law. *Id*. at 233. Other cases confirm that improper racial motivation may support an equal protection violation. *E.g., Reitman v. Mulkey*, 387 U.S. 369, 374 (1967) (striking down law with "immediate design and intent" of racial discrimination); *Griffin v. Cty. Sch. Bd. of Prince Edward Cty.*, 377 U.S. 218, 231 (1964) (closing schools motivated by race unconstitutional in spite of "nonracial grounds").

Here, Defendants proudly tout their racial motivation. The Plan is driven by the desire to help borrowers based on race. Critically,

Defendants have not asserted that this program is narrowly tailored to serve a compelling government interest. Therefore, it cannot pass strict scrutiny and must be enjoined. *See Adarand*, 515 U.S. at 229.[10]

## III.   Plaintiff Will Be Irreparably Harmed Absent an Injunction

Constitutional violations constitute "proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303, n.3 (7th Cir. 1978). Here, an injunction would prevent a constitutional violation. Absent one, Defendants will deplete the federal treasury by up to $1 trillion. Once action is taken, a court cannot turn back the clock. "Once a loan is forgiven, it cannot easily be undone." *Id.* at 477–78.

Moreover, irreparable harm is "harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (citation omitted). Damages are not available in this case because of sovereign immunity: "Federal constitutional claims for damages are cognizable only under *Bivens*." *Loumiet v. United States*, 828 F.3d 935, 945 (D.C. Cir. 2016). Since monetary relief is not available here, the harm is irreparable.

---

[10] Under Count 3, Plaintiff-Appellant alleges a violation of the APA. Doc.1:11–12. For all the same reasons outlined above, Defendants' actions also violate the APA.

## IV. The Public Interest and Balance of Harms Weigh Heavily in Favor of an Injunction

The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The "public interest would be served" by an injunction preventing a constitutional violation. *Preston*, 589 F.2d at 303, n.3. And the "government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented." *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017).

## CONCLUSION

Plaintiff requests that the Court issue an injunction pending appeal enjoining Defendants from implementing the Plan.

Dated this 11th day of October, 2022.

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*s/ Daniel P. Lennington*

Richard M. Esenberg
Daniel P. Lennington
330 E. Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Dan@will-law.org
*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2) because this motion contains 5,198 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f).

This motion complies with the typeface requirements of Federal Rules of Appellate Procedure 27(d)(E), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this motion has been prepared in a proportionately spaced typeface using the 2016 version of Microsoft Word in 14-point Century Schoolbook font.

Dated: October 11, 2022

*s/ Daniel P. Lennington*

DANIEL P. LENNINGTON